UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**John Paull, Jr.,**

       **Plaintiff,**         **Civil Action No. 11-11733**

    vs.                  **District Judge George Caram Steeh**

**Michael J. Astrue,**      **Magistrate Judge Mona K. Majzoub**
**Commissioner of**
**Social Security,**

       **Defendant.**
_____/

**Report and Recommendation**

Before the Court are Plaintiff John Paull, Jr., and Defendant the Commissioner of Social Security's motions for summary judgment.[1] (Dkt. 12, 18.) The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 2.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation.

**I.    Recommendation**

Because the ALJ failed to compare Mrs. Paull's alleged disabilities to the required listings, the Court recommends granting Plaintiff's motion in part, denying Defendant's motion, and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g) for re-analysis at Step Three of the social security disability framework.

**II.    Report**

---

[1]Susan R. Paull was the original plaintiff in this suit. On November 12, 2011 she passed away. (Dkt. 16.) John Paull, Jr., her husband, filed a motion and affidavit to proceed in this case. (*Id.*) Defendant did not oppose the motion. (Dkt. 18.) The Court granted his request. (See dkt. text only order granting substitution.)

**A.    Facts**

    **1.    Procedural facts**

In June, 2006 Mrs. Paull filed for social security disability benefits. (AR at 88-90.) She initially alleged that she had been disabled since October 15, 2004. But she amended her onset date to April 22, 2006. (*Id*. at 57, 88-90.) In July, 2006 her claim was initially denied. (*Id*. at 70.) She sought review of the denial and an ALJ held a hearing in October, 2008. (*Id*. at 13.) In November, 2008 the ALJ issued a written decision denying Plaintiff's request for review. (*Id*. at 23.) Plaintiff sought review from the Appeals Council, which denied her request. (*Id*. at 1.) Plaintiff then filed this suit seeking judicial review of Defendant's decision pursuant to 42 U.S.C. § 405(g).

    **2.    The ALJ's written denial**

The ALJ found that Mrs. Paull had the following severe impairments: diabetes, status post coronary artery bypass surgery, hypertension, and peripheral vascular disease. (AR at 25.) Despite finding these severe impairments, the ALJ determined that the impairments, considered alone or in combination, did not meet or medically equal a listed impairment in 20 C.F.R. part 404, subpart p, appendix 1. (*Id*.)

In determining so, the ALJ made two summary comments:

> In April 2006, [Mrs. Paull] underwent triple coronary artery bypass surgery[.] Within three months, the treating physician noted that [Mrs. Paull] was doing well from a cardiac standpoint[.] In addition, [Mrs. Paull's] diabetes and hypertension have been characterized as stable.

> In November 2007, [Mrs. Paull] was treated for an infected aortobifemoral arterial bypass graft placement and underwent excision of the bypass graft with patch angioplasty in February, 2008[.] By May 2008, the treating physician noted that [Mrs. Paull] was doing well and that all incisions had healed[.]

(AR a 25-26.)

The ALJ then presented a more thorough presentation of the record. The ALJ noted Mrs. Paull's April 2006 cardiac surgery and the difficulty Mrs. Paull had with the healing in her legs. (AR at 26.) The ALJ reviewed Mrs. Paull's testimony that she had cardiac surgery in April, 2006 and that her leg was healing with difficulty. (*Id.*) The ALJ stated that Mrs. Paull testified that she had infections in her leg and that she experienced numbness in her legs when she walked. (*Id.*) The ALJ then stated that Mrs. Paull testified that she had to elevate her feet in the morning and that she had difficulty climbing stairs. (*Id.*) The ALJ noted that Mrs. Paull said she had diabetes and had to monitor her blood sugar regularly and that she had two hernias and had shortness of breath when she bent over. (*Id.*) The ALJ also noted that Mrs. Paull testified that she was able to drive and perform light chores, with frequent rest periods. (*Id.*)

The ALJ then concluded that the objective medical evidence did not corroborate Mrs. Paull's testimony about the extent of her limitations. (AR at 26.) The ALJ stated that, starting in April, 2006, Mrs. Paull underwent cardiac catheterization, experienced a cardiac arrest, underwent triple coronary artery bypass surgery, and placement of a dual chamber implantable cardiac defibrillator before discharge from the hospital. (*Id.*) The ALJ then stated that, in May, 2006, Mrs. Paull's treating physician noted that she was "doing well" and indicated her left vein graft harvesting site had minimal erythema, that her echocardiogram indicated an ejection fraction of 40%, and that there had been a marked improvement in left ventricular function. (*Id.*) The ALJ also stated that Mrs. Paull's treating physician noted that her hypertension was under excellent control. (*Id.*) The ALJ then reviewed the June 2006 records. (*Id.*) The ALJ stated that those records showed that Mrs. Paull was evaluated for complaints of swelling in the left lower extremity, but that she exhibited no shortness of breath, clear lungs, and a normal right lower extremity. (*Id.*) The ALJ stated that those

3

records also showed that the incisions from the grafting were healing well and that Mrs. Paull was "doing well" from a cardiac standpoint. (*Id*.)

The ALJ then noted that Mrs. Paull did not seek significant treatment from June, 2006 until November, 2007. (AR at 26.) In November, 2007 the ALJ noted that Mrs. Paull was evaluated for an infected aortobifemoral arterial bypass graft placement. (*Id*.) The ALJ then stated that, in February, 2008, Mrs. Paull underwent excision of the bypass graft with patch angioplasty. (*Id*.)

The ALJ stated that, in April, 2008, Mrs. Paull's treating physician noted that her incisions were healed and that she was increasing her activities. (AR at 27.) A month later, the ALJ stated, exhibits showed that Mrs. Paull exhibited 1+ pedal edema in the left lower extremity and clear lungs. (*Id*.) During that time, the records also showed, the ALJ found, that Mrs. Paull stated that she was doing well and going about her activities of daily living without shortness of breath. (*Id*.)

By August, 2008 the ALJ pointed out that Mrs. Paull's treating physician indicated that she was doing well, was increasing her activity, and had no back pain. (AR at 27.) The ALJ noted that an ultrasound of the left lower extremity indicated a widely patent bypass. (*Id*.) But the ALJ also noted that Mrs. Paull was evaluated for claudication of the right leg and diagnosed with significant multi-level occlusive disease. (*Id*.)

The ALJ reviewed Mrs. Paull's diabetes, hypertension, and retinopathy, noting that records reflected that Mrs. Paull had these issues under control. (AR at 27.)

The ALJ stated that after Mrs. Paull received her defibrillator, she was noted to be doing well and exhibited a marked improvement in left ventricular function. (AR at 27.) The ALJ further noted that "subsequent evaluations consistently indicate[d] that [Mrs. Paull's] lungs [were] clear with no evidence of shortness of breath." (*Id*.)

The ALJ pointed out that Mrs. Paull had not sought significant treatment from June, 2006 through November, 2007, which the ALJ stated was "inconsistent with allegations of disability." (AR at 27.) The ALJ stated that this fact was consistent with Mrs. Paull's treating physician's assessment that Mrs. Paull's condition was stable, that her hypertension was under excellent control, that her diabetes was stable, and that her incisions were healing well. (*Id.*)

The ALJ noted that Mrs. Paull experienced an infected aortobifemoral arterial bypass graft placement and underwent excision of the bypass graft with patch angioplasty, but that, within a few months, the records showed that she was "doing well, was going about her activities of daily living without shortness of breath, and all her incisions had healed." (AR at 27.)

The ALJ acknowledged that Mrs. Paull's treating physician, in August, 2008, indicated that she was doing well and that she had no limitations regarding sitting, standing, or walking. (AR at 27.)

The ALJ noted that, in July, 2006, the state agency concluded that Mrs. Paull could perform light work. (AR at 27.) That assessment, the ALJ concluded, was consistent with the medical evidence. (*Id.* at 28.) But the ALJ determined that, since Mrs. Paull alleged that she had difficulty climbing stairs, that the ALJ would limit Mrs. Paull to the occasional climbing, crouching, crawling, kneeling, and stooping. (*Id.*) The ALJ also limited Mrs. Paull to moderate exposure to hazards. (*Id.*)

The ALJ then determined that Mrs. Paull was capable of performing her past relevant work as a medical office assistant. (AR at 28.) The ALJ noted that the vocational expert characterized Mrs. Paull's past work as skilled, sedentary work with transferable skills to other office clerical jobs. (*Id.*) The ALJ also stated that, even if Mrs. Paull was limited to sedentary work, she could still

perform her past relevant work. (*Id*.)

The ALJ then directed a finding of not disabled. (AR at 28.)

### 3. October 8, 2008 hearing

On October 8, 2008 Mrs. Paull appeared and testified at her hearing. (AR at 31.) At the hearing, Mrs. Paull described how she spent her day. (*Id*. at 44-45.) She stated that she usually got up around eight or nine a.m. and that she immediately checked her glucose level and took all her medications. (*Id.*) She then stated that she prepared and ate her breakfast, and then sat for a while, because her feet started to swell from standing. (*Id*. at 45.) After resting, she stated that she would take a shower, get dressed, and then take a little rest before lunch. (*Id*.) After that rest, she stated that she would check her blood sugar levels, again, then she would eat lunch, do the dishes, and then rest for another thirty to forty-five minutes. (*Id*.) She then stated that she would usually run errands with her husband, but only for forty-five minutes to an hour. (*Id*.) When they returned, she stated she would get rest before dinner and then get ready for dinner and eat. (*Id*.) After dinner, she stated that she and her husband would go for a short walk, if the weather was ok. (*Id.*) Mrs. Paull added that she was able to drive herself when her husband was not available. (*Id*.) She also added that she was able to do laundry, but usually only one load at a time, because she had difficulty walking up and down the stairs. (*Id*. at 46.) She did state that she shopped for groceries sometimes, but that she used the automatic cart to get around. (*Id*.)

Mrs. Paull then discussed why she thought she could not return to work. (AR at 48.) She first stated that she had a quadruple bypass surgery and then a pacemaker put in. (*Id*.) She added that she was having difficulty with her left leg, the leg from which the surgeons took a vein. (*Id*.) She explained that her leg would not heal properly. (*Id*.) She then explained that she had to go on

intravenous antibiotics because she had an infection from her surgeries. (*Id*. at 49.) Other than her bypass issues and complications, Mrs. Paull added that she felt that she was disabled due to a herniated disk and bilateral carpal tunnel. (*Id*. at 51.)

Mrs. Paull then testified as to her functional limitations. (AR at 50-51.) She stated that she could only walk the length of the room she was in before she felt a vise-like grip in her calves. (*Id*. at 51.) She surmised that she could stand for ten minutes. (*Id*. at 52.) As for sitting, she stated that she could sit for thirty minutes before she had to get up again. (*Id*.)

When questioned why she believed she could not return to work, Mrs. Paull answered that she had to take regular rest periods. (AR at 52-53.) She added that she felt that she could not give one hundred percent to any employer because she had to get up and move around, and that her legs went numb, and that she could not bend, and that she could not sit too long, and that she could not stand too long. (*Id*. at 53.) She stated that she experienced swelling in both of her legs. (*Id*. at 62.) To alleviate the pain and swelling, she explained that she had to elevate her legs for five minutes. (*Id*.) She stated that, during a normal day, she would have to stop and rest to manage her symptoms at least four or five times for thirty to forty-five minutes each time. (*Id*. at 63.)

### 4. Vocational expert testimony

The vocational expert testified that Mrs. Paull's past work were categorized as semi-skilled work performed at the sedentary level. (AR at 65.) The vocational expert stated that the skills from Mrs. Paull's past work were transferable to office clerical positions. (*Id*.)

The ALJ posed the following hypothetical question to the vocational expert:

> Let's assume we have a hypothetical claimant with [Mrs. Paull's] age, education, and past work experience, and with the residual functional capacity to perform the full range of light work, but with the following additional restrictions: occasional climbing, crouching, crawling, kneeling, and stopping [sic], and no more than

> moderate exposure to hazards, such as extreme cold and electrical parts or machinery.

(AR at 66.) When posed with this hypothetical person as well as the additional limitation of sedentary work, the vocational expert testified that Mrs. Paull could perform her past relevant work. (*Id*. At 66-67.)

### 5. Medical evidence

On June 16, 2006 Mrs. Paull filled out a disability report. (AR at 118.) Mrs. Paull reported that she was able to prepare her own meals, although she sometimes had difficulty opening jars, and that sometimes her hands were numb and painful. (*Id*. at 120.) She stated that meal preparation took her no longer than thirty minutes. (*Id*.) She added that she had been able to do more cooking, but that she started getting tired from standing so much while cooking, that she had to decrease her cooking. (*Id*.) She stated that she could fold clothes. (*Id*.) She did explain that she needed help from her husband to do some of her housework, because she became fatigued and had pain. (*Id*.) She also stated that she went outside, daily, if she felt "up to it." (*Id.* at 121.)

Mrs. Paull stated that she experienced numbness and pain in both her upper and lower body and that she fatigued easily. (AR at 123.) She maintained that she could walk a few minutes before she needed to rest. (*Id*.) She added that, after a few minutes, she could walk again. (*Id*.)

On April 21, 2006 Mrs. Paull was seen by Dr. Paul W. Koch, M.D. (AR at 148.) He examined her and stated that she had "mildly diminished breath sounds and . . . trace edema on both legs bilaterally." (*Id*.) But "otherwise," Dr. Koch stated that Mrs. Paull had an "unremarkable physical examination." (*Id*.) Dr. Koch referred Mrs. Paull to Dr. Alaa G. Mansour, M.D. (*Id*.)

On April 22, 2006 Mrs. Paull was seen by Dr. Mansour. (AR at 143.) Dr. Mansour diagnosed Mrs. Paull with: unstable angina, pneumonia, congestive heart failure, diabetes, peripheral

arterial disease, hiatal hernia, hypertension, and dyslipidemia. (*Id*.) Dr. Mansour noted that Mrs. Paull had experienced claudication in her calves. (*Id*. at 150.) Dr. Mansour also noted that Mrs. Paull reported having her diabetes under "good control." (*Id*.)

On April 24, 2006 Mrs. Paull was admitted to St. John Hospital for cardiac catheterization. (AR at 161.) During that admission, Mrs. Paull had an asystolic arrest. (*Id*.) She was intubated and then had an urgent revascularization. (*Id*.) She then had an "emergent coronary artery bypass grafting times four." (*Id*.) The surgeon reported that Mrs. Paull "tolerated the surgery well and was transferred . . . in stable condition." (*Id*.) On May 3, 2006 Plaintiff had a defibrillator implanted. (*Id*. at 162.)

By May 5, 2006 physician Sarine John-Rasman noted that, compared to Mrs. Paull's April 29, 2006 study, Mrs. Paull's left ventricular systolic function appeared improved. (AR at 185.)

On May 23, 2006 Dr. Muna Beeai, M.D., saw Mrs. Paull. (AR at 262.) Dr. Beeai noted that Mrs. Paull appeared in "no distress." (*Id.*)

Dr. Patrick L. Murphy, M.D., noted, on May 30, 2006, that Mrs. Paull had mild background retinopathy. (AR at 189.) He further noted that there was no evidence of progressive disease. (*Id.*) Dr. Murphy also stated that Mrs. Paull had "[g]ood control of [her] diabetes." (AR at 192.)

On June 8, 2006 Dr. Beeai saw Mrs. Paull for a routine followup. (AR at 253.) Dr. Beeai noted that Mrs. Paull had developed severe swelling and pain her left foot. (*Id.*) Dr. Beeai further noted that the swelling could have been the result of taking her off of her diuretics too fast. (*Id.*) Dr. Beeai stated that Mrs. Paull was back on her diuretics and was tapering them slowly. (*Id.*) Dr. Beeai reported that Mrs. Paull denied pain or change in temperature in her foot. (*Id.*) Although Dr. Beeai also reported that Mrs. Paull stated that she was still tired when she tried to do things. (*Id.*)

9

Dr. Beeai noted that Mrs. Paull was a healthy-looking female in no distress. (*Id.*) Dr. Beeai noted that Mrs. Paull exhibited normal exam results and specifically noted that Mrs. Paull's incisions were healing well. (*Id.*)

On July 27, 2006 Dr. Jack Kaufman, M.D., conducted a physical residual functional capacity assessment of Mrs. Paull. (AR at 271.) He found that Mrs. Paull could stand and/or walk (with normal breaks) for a total of six hours in an eight hour workday. (*Id.* at 265.) And he found that she could sit for the same amount of time. (*Id.*) He also found that she could push and/or pull for an unlimited amount of time. (*Id.*) The rest of the PRFC was unremarkable.

On February 21, 2008 Mrs. Paull underwent a procedure for an infected aortobifemoral arterial bypass graft. (AR at 272.) The report indicates that Mrs. Paull had had significant difficulties with her groin incisions healing. (*Id.*) The report shows that Mrs. Paull had to have "multiple debridements and prolong antibiotic therapy." (*Id.*)

A May 16, 2008 update shows that Mrs. Paull was "going about . . . her activities with no sense of shortness of breath, chest pressure, chest tightness or need for nitroglycerin." (AR at 298.)

On August 6, 2008 Dr. Beeai received an update about Mrs. Paull. (AR at 292.) The update showed that Mrs. Paull "continue[d] to do well increasing her activity over time." (*Id.*) The update also shows that Mrs. Paull's incisions were healed. (*Id.*)

On August 25, 2008 Dr. Beeai noted that Mrs. Paull had her diabetes well controlled. (AR at 323.)

**B.     Standards**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether the

Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1. Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

1. he was not presently engaged in substantial gainful employment; and
2. he suffered from a severe impairment; and

    3. the impairment met or was medically equal to a "listed impairment;" or
    4. he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

    **C.    Analysis**

Plaintiff has framed three issues for judicial review:

> Whether Defendant properly determined that Mrs. Paull's peripheral artery disease did not meet Listing 4.12c.
>
> Whether Defendant's finding that Mrs. Paull can perform light work and can return to her past relevant work as a "medical office assistant" is based on substantial evidence.
>
> Whether Defendant failed to properly apply the Sixth Circuit pain standard and made credibility findings that were not based on a full and accurate reading of the record.

(Dkt. 12, Pl.'s Mot. for Summ. J. at 2.) The Court substantially addresses the first and third issues.

    **1.    The Court recommends remanding for reconsideration at Step Three**

Plaintiff first argues that the ALJ did not properly determine that Mrs. Paull's peripheral artery disease did not meeting Listing 4.12c. The Court agrees–although the ALJ presented a thorough review of the record, she failed to compare the medical evidence to the listings. Such a failure requires remand.

"In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing."[2] *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 125 (6th Cir. 2003) (citation omitted). "It is insufficient that a claimant comes close to meeting the requirements of a listed impairment." *Id*. (citation omitted). But "a claimant is also disabled if her impairment is the *medical equivalent* of a listing . . . which means it is 'at least equal in severity and duration to the criteria of any listed impairment." *Reynolds v. Comm'r*, 424 F.App'x 411, 414 (6th Cir. 2011) (citations omitted).

To determine whether a claimant is entitled to benefits an ALJ "must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds*, 424 F.App'x at 415. Failure to evaluate the evidence with the listings is not harmless error. *Id*. For without the ALJ's discussion the Court cannot conduct "meaningful judicial review" and "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id*. (citations omitted).

Here, Plaintiff alleges that Mrs. Paull had peripheral arterial disease. The ALJ noted that Mrs. Paull had that severe impairment. To meet the listing, though, Mrs.Paull had to satisfy the

---

[2]The impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(iii).

following criteria:

> Peripheral arterial disease, as determined by appropriate medically acceptable imaging . . . causing intermittent claudication and one of the following:
> A. Resting ankle/brachial systolic blood pressure ratio of less than .50.
> OR
> B. Decrease in systolic blood pressure at the ankle on exercise . . . of 50 perfect or more of pre-exercise level and requiring 10 minutes or more to return to pre-exercise level.
> OR
> C. Resting toe systolic pressure of less than 30 mm Hg[.]
> OR
> D. Resting toe/brachial systolic blood pressure ratio of less than 0.40[.]

20 CFR Pt. 404, Subpt. P, App. 1, 4.12.

Here, the ALJ did not analyze the record evidence with the alleged severe impairment listings. Because she failed to do so, the Court recommends remanding for reconsideration of this issue.

Defendant argues that, although Mrs. Paull has presented evidence that she suffered from peripheral arterial disease (AR at 254) and that she had claudication (AR at 298), she failed to show that she had a resting toe systolic pressure of less than 30 mmHg for a period of twelve consecutive months. (Def.'s Mot. for Summ. J. at 8.) Defendant points out that one record, from August, 2008, showed that Mrs. Paull had a systolic toe pressure that was less than 30 mmHg in both the right and left toes, Defendant points out that a March 2008 report showed that Mrs. Paull's systolic toe pressure was 44 mmHg. (Def.'s Mot. at 8, citing AR 283, 285.)

While Defendant does show that there may be an issue with Plaintiff ultimately showing that Mrs. Paull could not meet the listing, the Court still recommends remanding–for the listing is not the end of the analysis, for the evidence presented by Mrs. Paull could be the medical equivalent of listing. Regardless of the evidence Defendant puts forth, the Court is unable to conduct a

meaningful judicial review without an appropriate ALJ's analysis of the evidence to the listing. *See Barbera v. Comm'r*, 11-13265, 2012 WL 2458284 (E.D.Mich. June 5, 2012) (Michelson, Mag.J) *adopted by* 2012 WL 2389977 (E.D.Mich. June 25, 2012) (Ludington, J.) (remanding the case because the ALJ failed to compare the medical evidence to a listing); *see also Christephore v. Comm'r*, 11-13547, 2012 WL 2274328 (E.D.Mich. June 18, 2012) (Roberts, J.) (same). The Court therefore recommends remand.

### 2. The ALJ did not err in assessing Mrs. Paull's credibility

Given that an ALJ is in the "best position to observe witnesses' demeanor and to make an appropriate evaluation as to their credibility," "an ALJ's credibility assessment will not be disturbed 'absent compelling reason.'" *Reynolds*, 424 F.App'x at 416-17 (citations omitted). The Sixth Circuit has instructed,

> [i]n making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence.

*Id*. (citing SSR 96-7p, 1006 WL 374186, at *2 (July 2, 1996)).

Here, the ALJ reviewed Mrs. Paull's testimony and then stated that "[t]he objective medical evidence does not fully corroborate [Mrs. Paull's] testimony regarding the extent of her limitations." (AR at 26.) The ALJ reviewed the evidence that she found supported Mrs. Paull's credibility determination. (*Id*.) The ALJ also noted that Mrs. Paull did not seek "significant treatment from June, 2006 through November, 2007." (*Id*. at 27.) The ALJ found that the lack of significant treatment was "inconsistent with the allegations of disability." (*Id*.) And the ALJ pointed out that Mrs. Paull's treating physician, in August, 2008, noted that Mrs. Paull was "doing well and there

15

were no limitations regarding sitting, standing, or walking." (*Id.*)  The ALJ held that these findings were "consistent with [Mrs. Paull's] ability to maintain her activities of daily living without significant difficulty." (*Id.*)

Plaintiff argues that the ALJ failed to "appreciate that the treatment between June 2006 and November 2007 . . . was anything but insignificant." (Pl.'s Resp. at 6.)  While Plaintiff does point to instances during which Mrs. Paull sought treatment, had various visits to doctors, and had intravenous antibiotics through a PICC line, Plaintiff has not demonstrated that these visits and treatments were work prohibitive.  The Court therefore recommends finding that a "compelling reason" does not exist to set aside the ALJ's credibility determination, for the ALJ presented a significant analysis of the record.

### 3.     The Court need not address Plaintiff's Step Four argument

Because the Court recommends remanding this matter for a Step Three analysis, the Court need not discuss Plaintiff's argument that the ALJ erred at Step Four in finding that Mrs. Paull could return to her previous work.  *See Reynolds*, 424 F.App'x at 417.

### D.     Conclusion

Because the ALJ failed to compare Mrs. Paull's alleged disabilities to the required listings, the Court recommends granting Plaintiff's motion in part, denying Defendant's motion, and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g) for re-analysis at Step Three of the social security disability framework.

## III.    Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28

U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: July 11, 2012            s/ Mona K. Majzoub
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: July 11, 2012            s/ Lisa C. Bartlett
                                Case Manager